Lynna **TURNBOW, aka Lynn Turnbow and Ed Turnbow, husband and wife, Plaintiffs,**

v.

**Thomas James WASDEN, Ida–Cal Freight Lines, Inc., an Idaho corporation, Defendants.**

**No. CV–R–83–105–ECR.**

United States District Court, D. Nevada.

March 29, 1985.

Glade L. Hall, Reno, Nev., for plaintiffs.

Victor A. Perry, Reno, Nev., for defendants.

## MEMORANDUM DECISION AND ORDER

EDWARD C. REED, Jr., District Judge.

This matter, coming before this Court December 18, 19, and 20, 1984; the plaintiffs appearing by the through their attorney, Glade Hall, Esq., and the defendants appearing by and through their attorneys Victor A. Perry, Esq., and Thierry Barkley, Esq.; the Court having heard the testimony of witnesses and the arguments of counsel, and having reviewed the exhibits filed, enters the following Memorandum Decision and Order.

Lynna Turnbow and Ed Turnbow, plaintiffs, brought this action against Thomas James Wasden, Ida-Cal Freightlines, Inc., defendants. Plaintiffs are citizens of Nevada; defendants are citizens of Idaho. Thus, jurisdiction is based on 28 U.S.C. § 1332(a)(1) and is not contested.

This is a personal injury action arising out of a truck-pedestrian accident which occurred on U.S. Highway 95 between Luning, Nevada, and Mina, Nevada, on the evening of September 16, 1981. Ms. Turnbow was crossing Highway 95 when she was struck and seriously injured by defendant Thomas James Wasden. Ms. Turnbow seeks damages based on the alleged negligence of Mr. Wasden. Mr. Turnbow seeks

damages for loss of services and loss of consortium of Ms. Turnbow.

*Facts*

The evidence produced at trial establishes the following facts. At approximately 10:00 p.m. on the night of September 16, 1981, on Highway 95 in the vicinity of Mina, Nevada, the plaintiff Lynna Turnbow was hit by a truck (a tractor pulling a trailer) driven by defendant Thomas Wasden. At the time of the accident Ms. Turnbow was crossing the highway. Ms. Turnbow suffered severe, almost fatal, injuries as a result of the accident.

Mr. and Ms. Wasden shared driving duties of what will be referred to here as the Wasden truck. At the time of the accident Mr. Wasden was driving and Ms. Wasden was asleep in the sleeper portion of the tractor. The truck the Wasdens were riding in was owned by their employer and co-defendant, Ida-Cal Freight Lines, Inc. (Ida-Cal). The Wasdens and the truck were on Ida-Cal business at the time of the accident.

The Wasdens had started out from Nampa, Idaho, at about noon that day, hauling a load of "swinging beef" (beef carcasses suspended from the roof of the trailer) toward Los Angeles where they were due to arrive early the next morning. At Hawthorne, Nevada, approximately thirty miles north of the accident site, the Wasden truck was joined by three other Ida-Cal trucks going to the same destination and they all proceeded south on Highway 95 toward Mina in a convoy with the Wasden truck leading.

Shortly before the convoy came upon the Turnbow pickup, another pickup had been observed by Mr. Wasden parked along the east side of the highway in the northbound lane. Mr. Wasden warned the other following drivers in the convoy with his C.B. radio to be on the lookout for that pickup truck. He slowed his truck to a speed of 50 miles an hour, and soon after that he spotted the Turnbow pickup parked along the west side of the south bound lane of the highway. Again he cautioned his fellow convoy drivers and continued on at the same reduced speed of 50 miles an hour, steering his truck toward the center of the highway, but in the southbound lane. The speed limit in the area was 55 miles per hour.

During the late afternoon and early evening of September 16, 1981, the Turnbows had been drinking. Ms. Turnbow had consumed a considerable quantity of beer. Just prior to the accident, as the Turnbows drove down Highway 95 in their pickup truck, Ms. Turnbow requested her husband to stop so that she could go to the bathroom. The Turnbows argued about whether they should stop for this purpose. They had also been arguing about whether Mr. Turnbow should take Ms. Turnbow home before or after he went to get gas for his truck. Mr. Turnbow was not thrilled about having to stop, but nonetheless pulled the pickup to the side of the highway and stopped with the truck lights on and engine running.

Ms. Turnbow alighted. She testified she was looking for a bush for concealment while she went to the bathroom and could find none on the west side of the highway (where the pickup was parked). She, therefore, decided to cross the highway, believing there would be a bush suitable for her purposes on the other side. Pictures of the scene indicate generally low growing bushes on both sides of the road, affording little potential for concealment.

Having relieved herself and apparently still unhappy with Mr. Turnbow, Ms. Turnbow started to walk home toward Luning, Nevada, which was several miles to the north, rather than to return to the pickup. However, after going a short distance, she reversed her direction and commenced to walk south, back along the east side of the highway parallel to where the truck was parked and, having reached that point, started to cross the highway. She had just crossed the centerline of the highway into the southbound lane when she looked to the north and saw Mr. Wasden's truck bearing down on her. The truck was al-

most on top of her. She heard a loud roar [1] and observed the large Wasden truck swerve to miss her. Then she was struck by the right front fender and bumper of the truck, receiving grave injuries. The Wasden truck almost missed Ms. Turnbow. Only the extreme right eighteen inches of the right fender and bumper hit her.

At the time she was struck Ms. Turnbow was grossly intoxicated. Later tests showed her blood alcohol was at a level of 0.274 at the time of the accident. Evidence received in the case indicates that at that level Ms. Turnbow's alertness and motor functions were greatly impaired. This Court notes that the blood alcohol level at which a driver in Nevada is presumed to be under the influence of alcohol is 0.10.

Ms. Turnbow testified that prior to the accident, when she was walking along the side of the highway outside of the pickup truck, she recalls seeing the lights of Mina, Nevada, which were about a mile south. However, she also testified that she failed to see the large Wasden truck bearing down on her until three seconds or less before she was hit. The Wasden truck was well lighted as it proceeded down the road toward Ms. Turnbow. Its headlights were on and it displayed numerous other lights from the front, including two which illuminated the luminous front of the large trailer which the Wasden tractor was pulling.

*Analysis*

It is clear from her testimony that when she started to cross the highway, Ms. Turnbow either failed to look up and down the highway at all, or was in such an inebriated condition that when she looked she was in such a fog that she couldn't see what any prudent normal, reasonable person would have seen, i.e., that the Wasden truck was rapidly approaching. Nonetheless, Ms. Turnbow stepped right out into the path of the truck as it sped toward her.

Ms. Turnbow testified she is far sighted and does not require glasses to see dis-

tances. She was familiar with the road, having driven on it a number of times before.

The night was very dark and overcast. There was no moon. The road was dry and was straight and relatively level for a distance of a mile north of the scene of the accident. As Mr. Wasden approached, he was alert looking at the Turnbow pickup parked by the side of the highway and also looking at the travel way of the highway. From a distance Mr. Wasden saw the tail lights on the Turnbow pickup blink one after another. This indicated to him that someone might be outside in back of the Turnbow pickup or had walked behind it. In view of the short period of time between the time Mr. Wasden saw the tail lights blink on the Turnbow pickup and his arrival at the pickup, as contrasted with the length of time required for Ms. Turnbow in her inebriated condition (which would have caused her to walk slowly) to get out of the pickup, walk across the highway, relieve herself, start walking toward Luning, then retrace her steps and eventually walk back along the east side of the road to a point opposite the pickup, and then cross the highway to the center, would indicate that the person outside the pickup whom Mr. Wasden saw walk in back of it was Ed Turnbow, not Ms. Turnbow.

There was nothing to alert Mr. Wasden that anyone would be intending at that time to cross the highway. His concern was that someone might get out of the pickup and step on the travel way or that the door of the pickup might be opened into the traffic lane. Seeing a person walk in back of a parked pickup was scant indication that that person or anyone else, was about to walk across that high speed, heavily travelled Highway 95 from the opposite side of the road from where the Turnbow pickup was parked.

As noted before, the Wasden truck contained a load of swinging beef. A load of

---

**1.** The loud noise Ms. Turnbow heard was probably the "Jake Brake" on the Wasden truck. This is a compression brake which, if set, automatically engages when the driver's foot is lifted from the accelerator. The testimony indicates that when Ms. Turnbow heard the loud noise Mr. Wasden had already lifted his foot from the accelerator and had begun to apply his brakes.

swinging beef requires greater caution on the part of the driver than some other types of freight loads. When the brakes are applied, or the truck is turned or stopped, the shifting of the high center of weight of the cargo may cause the tractor and trailer to become difficult to control. However, under the circumstances, Mr. Wasden's actions in continuing down the highway and steering toward the center of the road to give the pickup a wide berth appear to be reasonable and prudent. He had reason to be concerned about the pickup, but no reason to anticipate someone would try to cross the highway from the opposite side.

The evidence is that Mr. Wasden did not see Ms. Turnbow on the highway until somewhere between twenty and fifty feet from the point of impact. It is unclear when Ms. Turnbow started to cross the highway, but it appears it was only a short time before the Wasden truck arrived on the scene. There is some evidence she might have been standing in the road, just prior to the accident, rather than crossing it, but the more credible evidence is that she was crossing the road when struck. She was wearing dark clothing and, when Mr. Wasden saw her, was turned to her side. Ms. Turnbow is not a large person and under the conditions of that evening Mr. Wasden could not see her until he came very close to her. When he did see her, Mr. Wasden immediately applied his brakes and swerved his truck into the northbound lane of the highway to try to miss Ms. Turnbow. Unfortunately, he was unable to do so. Ms. Turnbow survived at all only by a miracle and the excellent medical care which she received.

Mr. Wasden did swerve the truck toward the east side of the highway. He could not, however, have swerved any further;

as it was, his left wheels left the highway on the opposite (east) side of the road as he tried to swing around her. In addition, if he had turned more sharply, the truck would have jackknifed or turned over. All witnesses agreed that if he had turned more sharply it would have caused more serious injury to Ms. Turnbow and injuries or fatalities to others at the scene. As soon as he did see her, Mr. Wasden exercised reasonable care seeking to avoid injury to Ms. Turnbow. He kept his truck under reasonable control.

This is not to say that Mr. Wasden was entirely blameless. He might have further diminished his speed. However, in the circumstances, his speed of 50 miles per hour does not seem unreasonable on that flat, open, level stretch of Nevada desert highway. Mr. Wasden had nothing more than knowledge of a pickup truck parked to the side of the road and knowledge that someone might be outside of the truck. If Mr. Wasden had notice that someone might be crossing the highway, he would have a duty to slow his vehicle to a greater extent than he did. *See* NRS 484.363.[2] However, he had no reason to believe someone would be crossing the highway at that time. Mr. Wasden was keeping a reasonable lookout for pedestrians or other hazards along the highway.

Mr. Wasden is not charged with any duty to anticipate that Ms. Turnbow would try to cross the highway at that time. Mr. Wasden is charged with the duty to operate his truck with the same degree of care and caution which an ordinary careful and prudent person would exercise under the same or similar circumstances. Although he was looking in the direction of where she was, he was not able to observe her until nearly on top of her. As noted above, the evi-

---

**2.** NRS 484.363 provides:

484.363 Duty of driver to decrease speed under certain circumstances. The fact that the speed of a vehicle is lower than the prescribed limits does not relieve a driver from the duty to decrease speed when approaching and crossing an intersection, when approaching and going around a curve, when approaching a hill crest, when traveling upon any narrow or winding highway, or when special hazards exist or may exist with respect to pedestrians or other traffic, or by reason of weather or other highway conditions, and speed shall be decreased as may be necessary to avoid colliding with any person, vehicle or other conveyance on or entering a highway in compliance with legal requirements and the duty of all persons to use due care.

dence indicates that she apparently did not come onto the highway and start to cross until he was quite close. Thus, this Court finds that any negligence on Mr. Wasden's part was at the most, very minimal.

■ Plaintiffs' counsel argued at the trial that, as Mr. Wasden approached, he should have focused his eyes on the highway rather than on the pickup truck in case someone was crossing the highway. Mr. Wasden is charged with exercising due care to avoid colliding with pedestrians upon any roadway and to exercise proper precaution upon observing any confused or incapacitated person upon a roadway. At any distance (until he was right at the location of the pickup), if Mr. Wasden was looking at the pickup he would also have seen the travelway of the highway at the same time, and vice versa. However, on what he could see Mr. Wasden should have been more concerned about problems which could arise in and around the pickup than that someone would decide to walk across the highway, from the side opposite to where the pickup was parked, just at the time he passed. To infer negligence, we would have to infer that Mr. Wasden failed to exercise due care and that he should have seen the intoxicated Ms. Turnbow. Nevada law does not require the driver of a vehicle to anticipate that a pedestrian will be walking in the middle of a highway with no marked crosswalk within miles, any more than a driver should anticipate that a vehicle approaching from the opposite direction would suddenly cross over to his lane of traffic. See *Johnson v. Brown,* 77 Nev. 61, 66, 359 P.2d 80, 82 (1961). As the Nevada Supreme Court noted in *Johnson* and affirmed in *Fennell v. Miller,* 94 Nev. 528, 530–531, 583 P.2d 455, 457 (1978):

"[I]t is not required of the driver of a vehicle to anticipate that a pedestrian would be crossing a boulevard in the middle of a block at any point other than within a marked crosswalk, any more than a driver should anticipate that a

vehicle approaching from the opposite direction would suddenly cross over into his lane of traffic. A driver cannot be charged with failure to exercise due care toward a person so crossing the boulevard, unless such person is observed in time for the driver to avoid colliding with him." (cites omitted)

As in *Johnson* and *Fennell,* in this case there is no evidence that Mr. Wasden should have anticipated Ms. Turnbow suddenly appearing in the middle of Highway 95. Further, as this Court found above, there is no evidence that Mr. Wasden saw Ms. Turnbow in time to avoid the collision.

Plaintiffs' counsel also argued that Mr. Wasden was going too fast because he would not have been able to stop his truck within the range of his headlights at the speed he was driving. However, Mr. Wasden's testimony was that he could have stopped within the 200 foot range of his headlights if he had "locked them up", meaning he had placed his vehicle into a skid by fully applying all brakes. The preponderance of the evidence is that that testimony is true.

It is further claimed that Mr. Wasden was late in meeting the schedule to get his load of beef to Los Angeles by the appointed time. However, this is irrelevant because Mr. Wasden had slowed his speed to only 50 miles per hour and was on the alert for any problem that might arise around the parked pickup truck. Hence, whether or not he was late was of no substantial consequence under the circumstances at the time of the accident. There was no reason for Mr. Wasden to sound his horn until he observed Ms. Turnbow on the highway and by then it was too late for the horn to have effectively warned Ms. Turnbow.[3]

In addition to lack of evidence that Mr. Wasden was negligent, defendants argue that Ms. Turnbow's own negligence precludes her recovery. Defendants cite the following statutes in support of their argu-

3. This Court also notes that Ms. Turnbow testified that she heard the "loud noise" of the brakes in light of her intoxicated state and the fact that a loud sound did not warn her, the horn would probably not have warned Ms. Turnbow.

ment that Ms. Turnbow's actions were negligent or negligent per se [4]:

"484.327 Crossing at other than crosswalks. Except as provided in NRS 484.-328:

1. Every pedestrian crossing a highway at any point other than within a marked crosswalk or within an unmarked crosswalk at an intersection shall yield the right of way to all vehicles upon the highway...."; and

"484.331 Pedestrians on highways; soliciting rides, business; pedestrians under influence of intoxicating liquors, drugs.

4. It is unlawful for any pedestrian who is under the influence of intoxicating liquors or any narcotic or stupefying drug to be within the traveled portion of any highway...."

Ms. Turnbow did owe a duty to yield to the Wasden truck. *See* NRS 484.327(1). Ms. Turnbow was under the influence of intoxicating liquor at the time she walked within the travel portion of the highway and, thus, was in violation of NRS 484.-331(4). She owed a duty to look in both directions before crossing the highway and, as mentioned above, either did not do so at all, or was in such an inebriated state that when she looked, she was unable to see what was coming. Although she owed a duty to be alert, Ms. Turnbow was not alert.

■ The ultimate issue here is whether Mr. Wasden was more or less negligent than Ms. Turnbow. Plaintiffs' attorney has done a highly skillful job of endeavoring to develop and exploit all the possible indications of negligence on the part of Mr. Wasden. Mr. Wasden's conduct was not perfect, but comparing the conduct of Mr. Wasden and Ms. Turnbow, Ms. Turnbow's conduct was far more negligent than that of Mr. Wasden. The preponderance of the evidence is that the negligence of Ms. Turnbow contributed more to cause the accident and her resulting injuries than any negligence of Mr. Wasden. Upon making this finding, this Court may not award any damages to Ms. Turnbow. *See* NRS 41.-141(1). Nevada law adopts the comparative negligence standard, thus, precluding recovery if plaintiff's actions are more negligent than defendant's. *Id.*

The Court notes that the case was ably and effectively presented by counsel for both sides. One must have great sympathy for the pain and terrible injuries suffered by Ms. Turnbow and for her present condition. However, the accident was more her fault than Mr. Wasden's fault.

■ In addition, Ed Turnbow seeks damages for loss of consortium and loss of services. A spouse [5] may maintain an action for loss of consortium against a third party tortfeasor where that tortfeasor has caused the other spouse to suffer bodily injuries. *See General Electric Co. v. Bush*, 88 Nev. 360, 367, 498 P.2d 366, 370–371 (1972). The right of action must be brought with the spouse's cause of action. *Id.* Further, the right is derivative and accordingly may accrue only to the extent that the other spouse has a cause of action against the alleged tortfeasor. *See Towse v. Hawaii*, 64 Hawaii 624, 647 P.2d 696, 705 (1982); *Laws v. Fisher*, 513 P.2d 876, 878 (Okl.1973); *contra Norwest v. Presbyterian Intercommunity Hospital*, 52 Or. App. 853, 631 P.2d 1377, 1381 (1981). Thus, judgment should be entered against Ed Turnbow.[6]

This memorandum decision and order shall constitute findings of fact and conclusions of law.

IT IS, THEREFORE, ORDERED that the Clerk of the Court shall enter judgment

---

**4.** In certain circumstances, it is reasonable to rely on the violation of statutes as a basis for negligence per se. *See Gordon v. Hurtado*, 96 Nev. 375, 379, 609 P.2d 327, 329 (1980).

**5.** This Court need not reach the issue of whether Ed Turnbow is legally the spouse of Lynn Turnbow in light of our conclusion that there is no cause of action for loss of consortium.

**6.** This position is also in accordance with the American Law Institute in Restatement.

in favor of defendants and against plaintiffs.