EDWARD A. TOWSE, et al., Plaintiffs-Appellants, *v.* STATE OF
HAWAII, et al., Defendants-Appellees

NO. 6487

CIVIL NO. 47733

JUNE 18, 1982

RICHARDSON, C.J., LUM, NAKAMURA, JJ.,
AND RETIRED JUSTICES OGATA AND MENOR
ASSIGNED TEMPORARILY

## OPINION OF THE COURT BY OGATA, J.

This is an appeal brought by Plaintiffs-Appellants, fifteen prison guards (hereinafter "appellant-guards") and certain of their wives (hereinafter "appellant-wives"), from an order of the Circuit Court of the First Circuit dismissing their action for defamation, false imprisonment and loss of consortium against Defendants-Appellees.[1] For the reasons set out below, we affirm.

### I.

This suit arises out of a series of incidents occurring in February of 1975, during the purported "overhaul"[2] of the Hawaii State Prison.

---

[1] Named as Defendants-Appellees in this suit are: the State of Hawaii; Nelson K. Doi, then Lieutenant Governor; Andrew Chang, then Director of the Department of Social Services and Housing; Ronald Amemiya, then Attorney General; Antone Olim, then Superintendent of the Hawaii State Prison; John Smythe, then Correctional Care Administrator; Elwood Reynolds, then Administrative Captain and Training Officer; Valentine A. Sieferman, then Adjutant General of the Hawaii Air National Guard; and John Does 1 through 10.

We note at the outset, that the State of Hawaii has been named a party to this action under HRS § 661-11 (1976), dealing with tort claims against the State where covered by insurance. However, uncontroverted affidavits submitted by the State establish that it possessed no insurance policy covering the subject matter of appellants' claims. Hence, we conclude that appellants' claim against the State for defamation and false imprisonment is precluded under our State Tort Liability Act, specifically HRS § 662-15(4) (1976), and therefore the dismissal of the State as a party was proper. Our treatment of this case, then, will be confined to the remaining Defendants-Appellees.

[2] On December 20, 1974, the Governor, citing the increasing incidents of violence and the potential explosiveness of the situation at the state prison, created a task force to investigate and identify problems plaguing that institution and to make recommendations for remedial actions. The task force was comprised of appellees Doi, Chang and Amemiya.

Pursuant to this charge, the task force, in turn. set up five committees, staffed by persons drawn from various departments of the state government, dealing with the personnel, policies and procedures, operations, training and programs of the prison.

The result of the task force's investigation was the recommendation that there be an "overhaul" of the prison. The overhaul included: a takeover and search of the prison by national guardsmen and police; the transferring of certain prison personnel; the recruiting and training of their replacements; the resignation of the Corrections Divisions Director; the repair and modification of the facilities; the implementation and modification of programs for the inmates and stricter financial control.

On the morning of February 10, 1975, pursuant to Executive Order No. 75-1, the Hawaii National Guard, with assistance from the Honolulu Police Department, and under the direction of the Governor's task force, took control of the prison. The take-over, part of the planned overhaul, was to effectuate a warranted search of the prison for contraband.[3]

Appellant-guards arrived for work on that morning as usual, along with approximately 70 other guards. Thirty-six of the guards, among them appellant-guards, were informed by a roll call that they were to be transferred from prison duty, also as part of the overhaul, and to report "up front". These guards were then either escorted or requested to go to a conference room to await a processing out of the facility.[4] They remained there approximately two to four hours while their lockers were searched.

The take-over generated almost instant news coverage. Consequently, later that day, appellee Doi, as chairman of the task force participated in a press conference to discuss the take-over and the prison overhaul. Appellant-guards allege that at this press conference appellee Doi uttered defamatory statements concerning them which were then widely disseminated throughout the state.[5]

Approximately a week later, on February 18, 1975, the task force publicly issued its findings in a preliminary report concerning the overhaul. Appellant-guards contend that this report also contained

---

[3] A validly executed search warrant was issued by Circuit Court Judge Robert Chang on February 9, 1975, authorizing a search of the prison, including all lockers of any inmate or prison personnel, for such contraband as guns, knives, dangerous instruments and drugs.

[4] In addition to being detained while their lockers were searched, the guards were also required, by regulation, to submit to a body search upon leaving the prison.

[5] At the February 10, 1975 press conference, appellee Doi is alleged to have stated:
Of the 45 prison personnel transferred to other jobs today, 36 were guards.
A major overhaul was "the only cure" for the violence-plagued prison.
The prison situation "was hopeless."
Certain prisoners, who have the right connections and want to escape, can escape.
Those who have the right connections and want drugs, can get them. The same is true for guns, alcohol and any other type of contraband you can name.
Some of the prison guards were hopelessly involved and the only way out was to train new staff.

defamatory matter concerning them.[6]

---

[6] The preliminary report prepared by the task force on the prison identifies problems in the system, recommends solutions, and details the effects of the overhaul. The following excerpt is that matter which is claimed by appellant-guards to be defamatory of them.

Forty-five personnel were put on administrative leave pending transfer to other positions. [Preliminary report page 1]

\*   \*   \*   \*   \*

First, the number and types of incidents at the prison strongly suggested that adult corrections officers and other personnel at the very least were lax in their duties, that some were, perhaps, tacitly or overtly cooperating with certain inmates, and that others were intimidated and under duress. [Preliminary report page 7]

\*   \*   \*   \*   \*

2. The security measures including the search of persons entering and leaving the prison facility are perfunctory at best and non-existent at worst.

3. In some instances some of the personnel have passively or actively been instrumental in permitting the presence of contraband inside the prison walls. In some instances some staff members have turned their backs on the presence of weapons which they knew to exist and in other instances they have actively cooperated in bringing contraband into the prison.

4. Intimidation of the staff is a matter of course. Guards and others have been threatened routinely, assaulted frequently, and possibly bribed on occasion. It should be noted that, except for two guards, adult corrections officers are not armed. [Preliminary report page 8]

\*   \*   \*   \*   \*

7. Although certain guards appear to be intimidated by certain prisoners or prisoner cliques, others appear to maintain quite the opposite relationship with inmates. There have been reported incidents of socializing, parties, and drinking of swipe or smuggled alcoholic beverages between certain personnel and inmates. [Preliminary report page 9]

\*   \*   \*   \*   \*

*Transfer of Personnel.*   The Task Force investigation has revealed that certain employees at the prison facility have been under tremendous pressure, that their effectiveness has been reduced, and that they might be of better service to the State in other positions. It would be in the interest of all concerned to transfer these employees to new jobs in the State government. It is important to emphasize that none of these employees is charged with a criminal offense and that not all of the transferees are being transferred for the same reason. The Task Force, however, does reserve the right to recommend the institution of criminal proceedings if it determines that prosecution is appropriate.

The Task Force has considered the possibility of keeping the existing prison employees intact, but has concluded that unless a newly trained staff is brought in and the remaining staff retrained, the attempt to "clean out" the prison, to upgrade its administration, and to reform its rehabilitative programs would either not succeed at all or would be only partially successful. [Preliminary report pages 15 and 16]

On March 10, 1976, appellants filed a complaint, subsequently amended on June 23, 1976, in the circuit court alleging five causes of action. First, appellant-guards allege that the statements by appellee Doi at the February 10, 1975 press conference had been defamatory. Second, appellant-guards allege that certain statements contained in the preliminary report issued by the task force were defamatory. Third, appellant-guards allege that their confinement in the prison conference room, effected by appellees Olim, Smythe, Reynolds, and Sieferman, constituted false imprisonment. The fourth and fifth causes of action, brought by appellant-wives, allege loss of consortium from the claimed defamation suffered by their husbands, appellant-guards, by appellees Doi and the individual members of the task force.

On October 1, 1976, appellees filed a motion to dismiss pursuant to Rules 12 and 56 of the Hawaii Rules of Civil Procedure (hereinafter "HRCP"). After consideration of the memoranda and affidavits in support and in opposition filed by the respective parties, the trial court, on December 10, 1976, granted the motion to dismiss as to all defendants on all counts.

On January 18, 1977, appellants noticed this appeal.

## II.

In the lower court, as we noted, appellees filed their motion to dismiss citing as its basis HRCP Rules 12 and 56. Although the language of the subsequent order is somewhat ambiguous, the court appears to have treated the motion as a motion to dismiss under HRCP Rule 12(b). However, in the arguments before this Court, by way of the briefs submitted and the oral arguments presented, there is considerable confusion as to the applicable standard of review. We therefore feel it necessary, as a threshold matter, to determine whether, for the purposes of our review, the order of the lower court was one granting summary judgment under HRCP Rule 56 or one granting a motion to dismiss for failure to state a claim under HRCP Rule 12(b)(6).

We have found, "[i]n certain circumstances, a motion to dismiss may be treated as one for summary judgment." *Au v. Au,* 63 Haw. 210, 212, 626 P.2d 173, 176, *aff'd on recon.,* 63 Haw. 263, 626 P.2d 181 (1981).

Rule 12(b) states, *inter alia:*

If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such motion by Rule 56.

Thus, in *Gonsalves v. First Insurance Co.,* 55 Haw. 155, 516, P.2d 720 (1973), we held that where the trial court considered a memorandum of law and a supporting affidavit in determining the merits of the motion, the order granting the motion was one for summary judgment and not on a motion to dismiss. We so found despite the fact the order had been entitled "Order Granting Motion to Dismiss", stating, "[t]his court is not foreclosed from recognizing the true nature of an order by the label put upon it by the circuit court." *Id.* at 160, 516 P.2d at 723.

Here, the order granting appellees' motion is entitled "Order Granting Dismissal of All Defendants on All Counts." However, as we noted, this is not dispositive of the nature of the motion. Rather, we observe that numerous memoranda and affidavits, both in opposition and support of the motion, have been filed by the parties. Moreover, it is clear from a reading of the order that the lower court considered these submissions in making its determination.[7] Hence, we conclude that the instant order was one granting summary judgment and not a motion to dismiss.

Consequently, upon this appeal, we next determine, as to the causes of action averred by appellants, whether any genuine issue as to a material fact had been raised and whether appellees had been entitled to summary judgment as a matter of law. HRCP Rule 56; *Namauu v. City & County,* 62 Haw. 358, 614 P.2d 943 (1980).

---

[7] The December 10, 1976 "Order Granting Dismissal of All Defendants on All Counts" reads:

This matter having come before this Court on November 4, 1976, November 18, 1976 and December 2, 1976, and this Court having considered all memoranda of law, the record on file herein and argument of counsel,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the State of Hawaii's Motion for Dismissal be granted as to the State of Hawaii and as to all named Defendants in both their individual and official capacities on all counts and that all Defendants are hereby dismissed from this action.

III.

We first address appellant-guards' defamation claims against appellee Doi and the individual members of the task force, appellees Doi, Chang and Amemiya.

Our courts have held that a non-judicial governmental officer does not enjoy an absolute immunity for his tortious acts. *Seibel v. Kemble,* 63 Haw. 516, 631 P.2d 173 (1981); *Orso v. City & County,* 56 Haw. 241, 534 P.2d 489 (1975); *Runnels v. Okamoto,* 56 Haw. 1, 525 P.2d 1125 (1974); *Medeiros v. Kondo,* 55 Haw. 499, 522 P.2d 1269 (1974); *Lane v. Yamamoto,* 2 Haw. App. 176, 628 P.2d 634 (1981); *Kajiya v. Department of Water Supply,* 2 Haw. App. 221, 629 P.2d 635 (1981).

We initially adopted this position in our decision in *Medeiros v. Kondo, supra.* In *Kondo,* plaintiff, a civil service employee of the State Department of Taxation, brought suit for damages against defendant, the director of the department, alleging that defendant had maliciously and wilfully attempted to force him to relinquish his job. The trial court ruled, in granting defendant's motion to dismiss or for judgment on the pleadings, that defendant, by virtue of his high governmental office, was absolutely immune from suit arising from the performance of his official duties. In reversing the trial court, we firmly rejected the view advanced in the federal courts, *Barr v. Matteo,* 360 U.S. 564 (1959), that non-judicial governmental officers are absolutely immune from tort actions. This rejection of the federal approach was predicated on our desire to effectuate a balance between the interest of a maliciously injured plaintiff and a good faith public official. We recognized that while the protection of governmental officials is certainly a legitimate interest,[8] and there-

---

[8] The justification for the privilege accorded to governmental officials is succinctly stated by the Supreme Court in *Barr.* The Court there states:

> The reasons for the recognition of the privilege have been often stated. It has been thought important that officials of government should be free to exercise their duties unembarrassed by the fear or damage suits in respect of acts done in the course of those duties — suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration policies of government.

Barr v. Matteo, *supra* at 571.

fore deserving of certain immunities, the resulting absolute bar to plaintiff's action was both unjust and unnecessary. Hence, we found that when an official "in exercising his authority is motivated by malice, and not by an otherwise proper purpose, . . . he should not escape liability for the injuries he causes." *Medeiros v. Kondo, supra* at 503, 522 P.2d at 1271. However, in our concern "to limit liability to only the most guilty of officials," *id.* at 504-505, 522 P.2d at 1272, we required of the injured party to demonstrate by clear and convincing proof that those officials were stirred by malice and not by an otherwise proper purpose. Consequently, since plaintiff there had not been given his inquiry into malice, the granting of the motion to dismiss or for judgment on the pleadings had been error.

Thus, we established that non-judicial governmental officials, when acting in the performance of their public duty,[9] enjoy the protection of what has been termed a qualified or conditional privilege.[10] *See Seibel v. Kemble, supra, see also* Park, *Defamation: A Study in*

---

[9] A non-judicial governmental official is not afforded a privilege in all cases. We believe, in order for such an official to enjoy the protections of a privilege he must fall within the "parameters of *Barr v. Matteo* . . . ." Runnels v. Okamoto, *supra* at 5, 525 P.2d at 1129. In *Barr* the Supreme Court stated:

> It is not the title of his office but the duties with which the particular officer sought to be made to respond in damages is entrusted — the relation of the act complained of to 'matters committed by law to his control or supervision,' which must provide the guide in delineating the scope of the rule which clothes the official acts of the executive officer with immunity from civil defamation suits.

Barr v. Matteo, *supra* at 573-574 (citations omitted).

From the foregoing, it is clear that both appellee Doi in making his statements to the press and the individual members of the task force in publishing the preliminary report were protected to a certain degree from liability. The task force preliminary report was made pursuant to the charge by the governor and thus was a legitimate exercise of its duty. The statements made by appellee Doi were likewise legitimate under the circumstances. We note that the "overhaul" aroused almost immediate public interest. Appellee Doi, as chairman of the task force, was certainly acting within his power in making statements to the press to inform the public as to the integrity of the action. Moreover, we also recognize that it is common practice for such administrative bodies, via a qualified spokesman, to issue statements to the media.

[10] In *Russell v. Am. Guild of Variety Artists*, 53 Haw. 456, 497 P.2d 40 (1972), we recognized the distinction between an absolute privilege and a conditional or qualified privilege in the area of defamation. *See also* Seibel v. Kemble, *supra.*

> [C]onduct which otherwise would be actionable is to escape liability because the defendant is acting in furtherance of some interest of social importance, which is

*Hawaii Law,* 1 U. Haw. L. Rev. 84 (1979). This privilege effectively shields the official from liability, and not from the imposition of the suit itself, to the extent that the privilege is not abused and thereby lost. Hence, we made clear in *Kondo,* that in order for an action to lie against an official acting under a claim of privilege, it is essential that the injured party allege and prove, to the requisite degree, that the official had been motivated by malice and not by an otherwise proper purpose.

At this juncture, we note that the parties to the action are somewhat uncertain as to the definition of "malice" which is to guide this Court. We realize that the word malice "has acquired a plethora of definitions", *Aku v. Lewis,* 52 Haw. 366, 376, 477 P.2d 162, 168 (1970). Here, we are urged to adopt either the constitutionally based "actual malice" test first enunciated in *New York Times Co. v. Sullivan,* 376 U.S. 254 (1964) and adopted by this Court in *Tagawa v. Maui Pub. Co.,* 49 Haw. 675, 427 P.2d 79 (1967), *appeal after remand,* 50 Haw. 648, 448 P.2d 337 (1968), *reh. denied,* 51 Haw. 44, 448 P.2d 345 (1969), or the "reasonable man" test we have, in the past, utilized in qualified privilege cases arising from a duty-interest analysis. *See Russell v. Am. Guild of Variety Artists, supra; Aku v. Lewis, supra.* We believe that in this case·the "reasonable man" test to be the correct rule of application.

In *Russell,* by way of a footnote, we noted that "[t]he word malice as used in the context of an abuse of a qualified privilege is not given the same meaning as that attributed to it in the constitutional privilege area." *Id.* at 463, n.4, 497 P.2d at 45. Thus, in the instance where

---

entitled to protection even at the expense of uncompensated harm to the plaintiff's reputation. The interest thus favored may be one of the defendant himself, of a third person, or of the general public. If it is one of paramount importance, considerations of policy may require that the defendant's immunity for false statements be absolute, without regard to his purpose or motive, or the reasonableness of his conduct. If it has relatively less weight from a social point of view, the immunity may be qualified, and conditioned upon good motives and reasonable behavior. The defendant's belief in the truth of what he says, the purpose for which he says it, and the manner of publication, all of which are immaterial when no question of privilege is involved, may determine the issue when he enters the defense of such a conditional privilege.

*Id.* at 460, 497 P.2d at 43, *quoting* PROSSER, THE LAW OF TORTS, 776-777 (4th ed. 1971).

malice is alleged to extinguish a qualified privilege, " 'defendant is required to act as a reasonable man under the circumstances, with due regard to the strength of his belief, the grounds that he has to support it, and the importance of conveying the information.' " *Id.* at 463, n.4, 497 P.2d at 45, *quoting* PROSSER, THE LAW OF TORTS, 795-796 (4th ed. 1971).

We subsequently have applied the malice requirement, as now defined, to defamation actions involving governmental officials. *Runnels v. Okamoto, supra.* In *Runnels,* plaintiff, the manager of a municipal arena, brought a defamation action against, among others, two governmental officials, an elected councilman for the City and County of Honolulu and a city council auditor. Plaintiff charged that these officials had made defamatory remarks about him to the press and also in an auditor's report concerning the management of the arena box office. The trial court granted summary judgment in favor of defendants. On appeal, we affirmed. In finding *Kondo* dispositive, and therefore adopting the malice requirement for defamation actions against non-judicial governmental officials, we found, that while the issue of the existence of malice is generally for the jury's determination, "when this issue has been removed from the case by uncontroverted affidavits and depositions, and the moving party is entitled to judgment as a matter of law, summary judgment will be granted." *Id.* at 6, 525 P.2d at 1129. Thus, we concluded, that summary judgment had been properly granted since the record did not reflect any suggestion that defendants had acted maliciously or for an improper purpose.

We are inclined to similarly conclude in this case before us. Here, from a review of the record, we adduce no clear and convincing proof as to the existence of malice and improper purpose, *Runnels v. Okamoto, supra* at 6, 525 P.2d at 1129; *Medeiros v. Kondo, supra* at 505, 522 P.2d at 1272, on the part of appellee Doi when making his statements to the press nor appellees Doi, Chang and Amemiya for the statements appearing in the task force's preliminary report. Rather, the record does reveal that the statements made by appellees were the result of extensive investigation by both state and county agencies.

Thus, as the Court found in *Runnels,* appellant-guards, by way of the affidavits, memoranda and exhibits submitted, have had their

inquiry into malice, and finding none,[11] we must conclude that summary judgment was properly granted as to this cause of action.

## IV.

We now address appellant-guards' second cause of action brought against appellees Olim, Smythe, Reynolds, Sieferman, and John Does 1 through 10, that their detention in the conference room for approximately two to four hours constituted false imprisonment which therefore entitles them to recovery.

Appellant-guards here argue that summary judgment had been improper because there exist genuine issues as to whether they had been restrained by threats or directives, whether they had consented to the alleged confinement, and whether appellees Smythe, Reynolds and Olim had participated in the alleged detention.

We agree that the affidavits presented do raise factual issues as to these points. However, what is not controverted by the record is the fact that the confinement, if any, was incident to proper legal authority, *i.e.,* a valid search warrant.

An action for false imprisonment has been characterized, in the common law, as protecting "the personal interest in freedom from restraint of movement." PROSSER, THE LAW OF TORTS, 42 (4th ed. 1971); *see generally* RESTATEMENT (SECOND) OF TORTS § 35 (1977). Among the elements recognized as necessary to the maintenance of an action for false imprisonment is that the act of confinement must have been effectuated without lawful privilege.

---

[11] The only proof presented by appellant-guards to support their contention as to the existence of malice is the affidavits of E. E. Papke and Oscar Johnson. These affidavits suggest that appellee Chang believed that there was no proof, nor would there be any proof after the search, that the designated transferees, among them appellant-guards, were carrying contraband into the prison.

However, we observe that it is uncontroverted that appellees Doi, Chang and Amemiya did not personally know appellant-guards. Moreover, both the press statements and the statements in the preliminary report are carefully tailored so as not to identify any particular person. Finally, we note that the statements issued contain the disclaimer that not all the persons transferred were being transferred for the same reason. Under these circumstances we do not think the appellees to have acted unreasonably so as to raise the suggestion of malice.

Harper and James, *The Law of Torts*, vol. 1 sec. 3.7, 226 (1956).[12]

Thus it is well settled that there can be no unlawful detention, and hence no action for false imprisonment, when such detention had been effected by valid legal process. *E.g., Smith v. County of Livingston*, 69 App. Div.2d 993, 416 N.Y.S.2d 130 (1979) (criminal arrest warrant); *Executive Commercial Services v. Daskalakis*, 74 Ill. App.3d 760, 393 N.E.2d 1365 (1979) (writ of *ne exeat*); *Olsen v. Karwoski*, 68 Ill. App.3d 1031, 386 N.E.2d 444 (1979) (involuntary mental commitment).

Moreover, we have held that even where an arrest or detention is effected without a warrant, the existence of probable cause to arrest is an affirmative defense to an action for false imprisonment. *House v. Ane*, 56 Haw. 383, 390-391, 538 P.2d 320, 325 (1975); *Lopez v. Wigwam Dept. Stores*, 49 Haw. 416, 423, 421 P.2d 289, 293-294 (1966).

Here, as we have noted, a search warrant was issued authorizing a general search of the prison and, specifically, a search of lockers of prison personnel. The validity of this warrant is not here in question. It is also undisputed that the alleged confinement of appellant-guards was a direct consequence of the search. The uncontroverted record reveals, that on the morning of February 10 appellant-guards arrived for work. They, along with other personnel, were only then told of their transfer from prison duty. At that point, the transfer of appellant-guards required a physical "processing out" of the facility. This "processing out" included a search of their lockers and person. Thus, during that period while they waited to be individually processed out they were allegedly confined for two to four hours in a conference room.

---

[12] Harper and James, in distinguishing false imprisonment from the related tort of malicious prosecution, states:

> False imprisonment is the invasion of the interest in freedom from unlawful confinement, while a malicious prosecution is the unlawful use of legal procedure to bring about a legal confinement. 'If the imprisonment is under legal process but the action has been carried on maliciously and without probable cause, it is malicious prosecution. If it has been extra judicial, without legal process, it is false imprisonment.'

*Id.* sec. 3.9 at 232 (footnotes omitted).

We believe, under certain circumstances, for an orderly execution of a search, pursuant to warrant, reasonable detention may be necessary and proper. *See Harbison v. Railway Company,* 327 Mo. 440, 37 S.W.2d 609 (1931); *contra, Barr v. County of Albany,* 50 N.Y.2d 247, 428 N.Y.S.2d 665 (1980).[13] We do not imply that a search warrant will in all instances legitimize the confinement. We only intimate that where, as is evident here, the confinement is a necessary part of the search, such confinement does not rise to the level of an unlawful detention. Therefore, we conclude that summary judgment was prudently granted.

## V.

We come now to the action brought by appellant-wives. They charge that they are entitled to damages, both general and punitive, for the loss of consortium occasioned by the alleged injury suffered by their respective husbands, appellant-guards, from the claimed defamation committed by appellees Doi, Chang and Amemiya.

---

[13] In Harbinson v. Railway Company, *supra,* the court held that where plaintiff had been restrained in a downstairs room while defendants, pursuant to a search warrant, searched the upstairs room of his premises, the resulting detention did not give rise to an action for false imprisonment. The court stated:

> We regard a reasonable surveillance of a party whose premises are being searched as a necessary part of the search authorized by the search warrant. To hold otherwise would afford such party an opportunity to secrete or destroy the thing searched for and thus effectively defeat the purpose of the search.

*Id.* at 452, 37 S.W.2d at 614.

We note that a somewhat contrary view was expressed by a New York court in Barr v. County of Albany, *supra.* There, defendants, deputy sheriffs, armed with search warrants conducted a drug raid on a private party. Plaintiffs, a group of party-goers, were arrested and transported to a police station where they were booked and fingerprinted. The issue on appeal was whether the search warrant had provided the legal authority to arrest defendants and thereby preclude an action for false arrest and false imprisonment. The court, recognizing the distinction between search and arrest warrants, concluded that the search warrant alone did not authorize the arrest. Hence, any detention pursuant solely to the search warrant had been extra-judicial and thus illegitimate.

We are mindful of the theoretical soundness of the *Barr* rationale. However, we think, the better view to be that expressed by the *Harbinson* court. We feel that detention, tempered by reasonableness and necessity, may be demanded in certain situations.

It is generally accepted that the action for loss of consortium is a derivative action, *i.e.*, the action by the spouse for loss of consortium is derivative of the action for damages by the injured spouse. *E.g., Jarvis v. Stone,* 517 F. Supp. 1173 (N.D. Ill. 1981); *Maidman v. Stagg,* 82 App. Div.2d 299, 441 N.Y.S.2d 711 (1981); *Dazzo v. Meyers,* 83 App. Div.2d 14, 443 N.Y.S.2d 145 (1981). Hence, where the initial claim of injury cannot be maintained the derivative action of loss of consortium must also fail. *See Nishi v. Hartwell,* 52 Haw. 188, 473 P.2d 116, *reh. denied* 52 Haw. 296, 473 P.2d 116 (1970).

Therefore, having determined that summary judgment had been properly granted as to the defamation claims, we find summary judgment also proper as to this claim by appellant-wives.

Accordingly, in finding all appellees deserving of judgment as a matter of law as to all the causes of action averred by all appellants, the order issued by the circuit court is hereby affirmed.

*Richard Turbin* for plaintiffs-appellants.

*Dudley Akama,* Deputy Attorney General *(Everett Cuskaden,* Deputy Attorney General, on the brief), for defendants-appellees.