JASON VICKERY and CHERIE VICKERY, Plaintiffs-Appellants/Cross-Appellees,
v.
DAMON KEY LEONG KUPCHAK HASTERT; DAVID P. McCAULEY, ESQ.; JAMESNER A. DUMLAO, ESQ., Defendants-Appellees/Cross-Appellants, and
JOHN DOES 1-20, MARY ROES 1-20, DOE CORPORATIONS AND OTHER ENTITIES 1-20, Defendants
No. 28586
Intermediate Court of Appeals of Hawaii.
February 13, 2009.
On the briefs:
Wayne M. Sakai, Michiro Iwanaga, Daniel M. Chen, (Sakai Iwanaga Sutton Law Group), for Plaintiffs-Appellants/Cross-Appellees.
Keith K. Hiraoka, (Roeca, Louie & Hiraoka), for Defendants-Appellees/Cross-Appellants.

MEMORANDUM OPINION
RECKTENWALD, C.J., FOLEY and NAKAMURA, JJ.
Plaintiffs-Appellants/Cross-Appellees Jason Vickery (Jason) and Cherie Vickery (Cherie), husband and wife, (hereinafter referred to collectively as the Vickerys) appeal from the Order Granting in Part Motion to Compel Arbitration and Ordering Stay of Action (Order Partially Granting Motion to Compel) filed in the Circuit Court of the First Circuit (circuit court)[1] on May 16, 2007.
Defendants-Appellees/Cross-Appellants Damon Key Leong Kupchak Hastert; David P. McCauley; and Jamesner A. Dumlao (collectively, Damon Key) filed a Motion to Compel Arbitration, requesting the circuit court to compel the Vickerys to arbitrate their respective claims against Damon Key in accordance with an arbitration clause in a Retainer and Service Agreement (Agreement) entered into by Jason and Damon Key. The circuit court granted the motion as to Jason, denied the motion as to Cherie, and stayed all proceedings in the civil action pending conclusion of the arbitration of Jason's claims against Damon Key.
On appeal, the Vickerys argue that the circuit court erred in granting Damon Key's motion to compel Jason to arbitrate his claim. The Vickerys request that we reverse the Order Partially Granting Motion to Compel as to Jason and remand this case to the circuit court with instructions for entry of an order declaring that Jason is not bound by the arbitration clause in the Agreement.
On cross-appeal, Damon Key argues that the circuit court erred when it denied Damon Key's motion to compel Cherie to arbitrate her claim. Damon Key requests that if we hold that Cherie is an intended third-party beneficiary of the Agreement, we reverse the denial of Damon Key's motion to compel Cherie to arbitrate her claims, or if we hold that Cherie is not an intended third-party beneficiary of the Agreement, we remand the case with instructions to dismiss Cherie's complaint with prejudice on the ground that Damon Key owed her no legal duty.

I. BACKGROUND
On April 24, 2004, Jason and Damon Key entered into the Agreement, whereby Damon Key agreed to assist Jason, an Australian citizen, in his immigration matters and attempt to become a permanent United States resident. The Agreement contained an arbitration provision.
On February 23, 2007, the Vickerys filed a complaint in the circuit court against Damon Key. In sum, the Vickerys argued that Damon Key had committed legal malpractice in their representation of Jason. The Vickerys also alleged that they had suffered "extreme pain and suffering, mental anguish, severe emotional and mental distress, disruption of lifestyle, and loss of enjoyment of life" and Cherie had "been deprived of the services, love, attention, consortium, companionship, comfort, and society of" Jason as a result of Damon Key's malpractice.
On April 17, 2007, Damon Key filed its answer and, on April 19, 2007, filed its Motion to Compel Arbitration. Damon Key argued that because Jason had signed the Agreement and the Agreement contained an arbitration provision, Jason was obligated to arbitrate his claims. Damon Key maintained that Cherie was obligated to arbitrate her claims, as well, because she was an intended third-party beneficiary of the Agreement.
On April 27, 2007, the Vickerys filed an opposition memorandum to the motion, arguing that the arbitration provision was unenforceable as to the Vickerys' respective claims. The arguments therein are substantially similar to the Vickerys' arguments on appeal.
On May 3, 2007, Damon Key filed a reply memorandum.
The circuit court held a hearing on May 7, 2007 on the motion and filed its Order Partially Granting the Motion to Compel on May 16, 2007.
The Vickerys timely appealed.

II. STANDARDS OF REVIEW

A. Motion to Compel Arbitration
A petition to compel arbitration is reviewed de novo. The standard is the same as that which would be applicable to a motion for summary judgment, and the trial court's decision is reviewed using the same standard employed by the trial court and based upon the same evidentiary materials as were before it in determination of the motion.
Sher v. Cella, 114 Hawai`i 263, 266, 160 P.3d 1250, 1253, reconsideration denied, 114 Hawai`i 181, 158 P. 3d 299 (App.), cert. rejected, 119 Hawai`i 287, 196 P. 3d 289 (2007) (quoting Douglass v. Pflueger Hawaii, Inc., 110 Hawai`i 520, 524-25, 135 P.3d 129, 133-34 (2006)).

B. Contract Interpretation
As a general rule, the construction and legal effect to be given a contract is a question of law freely reviewable by an appellate court. The determination whether a contract is ambiguous is likewise a question of law that is freely reviewable on appeal. These principles apply equally to appellate review of the construction and legal effect to be given a contractual agreement to arbitrate.
Brown v. KFC Nat'l Mgmt. Co., 82 Hawai`i 226, 239, 921 P.2d 146, 159 (1996) (internal quotation marks and citations omitted).

III. DISCUSSION

A. Appeal
The Vickerys argue that the circuit court erred in granting the Motion to Compel Arbitration as to Jason.
Hawaii Revised Statutes (HRS) § 658A-6 (Supp. 2008) provides:
§658A-6 Validity of agreement to arbitrate. (a) An agreement contained in a record to submit to arbitration any existing or subsequent controversy arising between the parties to the agreement is valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract.
(b) The court shall decide whether an agreement to arbitrate exists or a controversy is subject to an agreement to arbitrate.
(c) An arbitrator shall decide whether a condition precedent to arbitrability has been fulfilled and whether a contract containing a valid agreement to arbitrate is enforceable.
(d) If a party to a judicial proceeding challenges the existence of, or claims that a controversy is not subject to, an agreement to arbitrate, the arbitration proceeding may continue pending final resolution of the issue by the court, unless the court otherwise orders.
In Douglass v. Pflueger Hawaii, Inc., 110 Hawai`i 520, 135 P. 3d 129 (2006), the Hawai`i Supreme Court stated:
`[W]hen presented with a motion to compel arbitration, the court is limited to answering two questions: 1) whether an arbitration agreement exists between the parties; and 2) if so, whether the subject matter of the dispute is arbitrable under such agreement." Koolau Radiology, Inc. [v. Queen's Med. Ctr., 73 Haw. 433, 445, 834 P.2d 1294, 1300 (1992)]. This court has stated that:
. . . .
Hawai`i has codified its endorsement of the enforceability of arbitration agreements in HRS ch. 658 (1993). The court has previously held that "under [Hawaii's] arbitration statute, before parties to a lawsuit can be ordered to arbitrate pursuant to [HRS] § 658-3 [(1993)] HRS § 658-1 requires that an enforceable, valid, and irrevocable agreement, in writing, exists." Koolau Radiology, Inc., 73 Haw. at 439, 834 P.2d at 1298.

Brown, 82 Hawai`i at 232, 921 P. 2d at 152 (some brackets in original) (footnote omitted).
Moreover,
" [t]his court has long recognized the strong public policy supporting Hawaii's arbitration statutes as codified in HRS Chapter 658. We have stated that '[t]he proclaimed public policy... is to encourage arbitration as a means of settling differences and thereby avoiding litigation.'" Bateman Constr., Inc. v. Haitsuka Bros., Ltd., 77 Hawai`i 481, 484, 889 P.2d 58, 61 (1995).

Lee v. Heftel, 81 Hawai`i 1, 4, 911 P.2d 721, 724 (1996) (brackets in original). However, "[e]ven though arbitration has a favored place, there still must be an underlying agreement between the parties to arbitrate. Without an agreement to arbitrate, a court may not force parties to engage in arbitration." Luke v. Gentry Realty, Ltd., 105 Hawai`i 241, 247, 96 P.3d 261, 267 (2004) (citations and internal quotation marks omitted); see also Moss v. Am. Int'l Adjustment Co., Inc., 86 Hawai`i 59, 63, 947 P.2d 371, 375 (1997) ("[A]rbitration must be agreed upon by the parties and evinced by a written agreement, despite the strong policy in its favor." (Citations omitted.)).
Id. at 530-31, 135 P.3d at 139-40 (footnotes omitted; some bracketed material in original and some added).

1. Whether arbitration provision ambiguous
The Vickerys maintain that the arbitration provision is unenforceable as to Jason because it is ambiguous. They claim that while Damon Key believed the arbitration agreement applied to Jason's legal malpractice claims, Jason reasonably believed that it only applied to fee disputes, given that (1) five of the eight provisions, plus additional paragraphs, in the Agreement dealt with fees, costs, and expenses and (2) Damon Key never explicitly advised Jason that his legal malpractice claims were subject to arbitration. The Vickerys contend that because the arbitration provision was ambiguous, there was no "meeting of minds," and, therefore, the agreement is unenforceable.
The arbitration provision of the Agreement provides the following:
7. Dispute Resolution. If any dispute arises between you and us with respect to any invoice issued by us or regarding our services to you, we and you agree that each will attempt to resolve the dispute with the other through friendly, amicable discussions and written correspondence, each in good faith attempting to understand and accept the merits of the other's positions. Should such negotiations fail to produce a mutually acceptable resolution of the dispute, we ask that you agree the dispute shall be submitted to mandatory binding arbitration. Such arbitration shall be conducted in accordance with the rules of the American Bar Association before an arbitrator or arbitrators selected in accordance with those rules or the rules of the Hawaii State Bar Association. The decision of the arbitrator(s) shall be final and binding on the parties. The arbitrator(s) shall have the discretion to order that the costs of arbitration, including the arbitrator's fees, other costs, and reasonable attorneys' fees of the prevailing party, shall be borne by the non-prevailing party.
Below the arbitration provision was an instruction to "[p]lease check whether you agree to this arbitration provision [.]' Jason checked "Yes. Agree."
In addition to the arbitration provision, the Agreement contains provisions entitled "Nature of Work/Client," "Rates/Fee Computation," "Retainer Deposit," "Costs and Expenses," "Invoicing Policy," "Payment Requirements," and "Termination."
In Douglass, The Hawai`i Supreme Court provided:
We stated in Earl M. Jorgensen Co. v. Mark Construction, Inc., 56 Haw. 466, 540 P.2d 978 (1975), that
[t]here must be a mutual assent or a meeting of the minds on all essential elements or terms to create a binding contract.
The existence of mutual assent or intent to accept is determined by an objective standard. Unexpressed intentions are nugatory when the problem is to ascertain the legal relations, if any, between two parties.

Id. at 470-71, 540 P.2d at 982 (citations omitted).
110 Hawai`i at 531, 135 P.3d at 140 (ellipses omitted).
Douglass involved various employment law claims by Douglass against his former employer, Pflueger Hawaii, Inc. dba Pflueger Acura (Pflueger). 110 Hawai`i at 522 & 524, 135 P.3d at 131 & 133. Pflueger filed a motion to stay the action and compel arbitration, in accordance with an Arbitration Agreement provision set forth in an Employee Handbook (the Handbook) Douglass had received during an employee orientation. 110 Hawai`i at 522-24, 135 P.3d at 131-33. The arbitration provision provided the following:
Any and all claims arising out of the employee's employment with the Company and his/her termination shall be settled by final binding arbitration....
The results of any arbitration shall be final and binding upon the parties. The parties agree not to institute any action in any court located in the State of Hawai`i or elsewhere against the other arising out of the claims covered by this paragraph.
Id. at 523, 135 P.3d at 132.
The circuit court granted the motion, and Douglass appealed. 110 Hawai`i at 524, 135 P. 3d at 133. On appeal, Douglass argued, among other things, that the arbitration provision was not a valid and enforceable contract, 110 Hawai`i at 523, 135 P.3d at 132, and that "although he signed the acknowledgment form verifying his receipt of the Handbook, he did not assent to the arbitration provision contained therein." Id. at 531, 135 P.3d at 140. Douglass argued
that he could not have known about the purported arbitration agreement to consent to it when: (1) the provision "consist [s] of two paragraphs of text buried, and hidden from sight, on page 20 of the 60 page ` [E]mployee [H]andbook'," and was not signed or initialed by him; (2) the signed acknowledgment form, which does not mention the purported arbitration agreement, is located forty pages away; and (3) immediately preceding the acknowledgment form is a section, entitled "DISCLAIMER," that provides in capitalized letters:
THE POLICIES DESCRIBED IN THIS HANDBOOK ARE INTENDED AS GUIDELINES REFLECTING CURRENT POLICIES AND ARE NOT INTENDED TO AND DO NOT CREATE A CONTRACT BETWEEN YOU AND THE COMPANY[;]
and (4) the acknowledgment section itself states in bold lettering that:
The provisions contained in this handbook are presented as a matter of information only and do not constitute an employee contract.
Id. at 532, 135 P.3d at 141 (emphasis in original).
The Hawai`i Supreme Court, citing to Brown, 82 Hawai`i at 238-40, 921 P.2d at 158-60, stated that
in order to be valid and enforceable, an arbitration agreement must have the following three elements: (1) it must be in writing; (2) it must be unambiguous as to the intent to submit disputes or controversies to arbitration; and (3) there must be bilateral consideration.
Douglass, 110 Hawai`i at 531, 135 P.3d at 140.
With regard to the second element in the Brown test, the supreme court held that on its face, the language in the arbitration agreement unambiguously stated that Douglass and Pflueger had mutually assented to the arbitration of any "employment-related disputes. Nonetheless, we cannot conclude that, in combination with the surrounding circumstances presented in this case, there is mutual assent between Pflueger and Douglass to arbitrate their disputes." Douglass, 110 Hawai`i at 532, 135 P.3d at 141 (internal quotation marks, citation, and brackets omitted).
The supreme court stated:
Here, Douglass merely acknowledged his receipt and understanding of the items presented to him. He never expressed assent to the terms contained in those items, except for those terms expressly stating that the policies in the Handbook did "not create a contract," were to be treated as "guidelines," and were presented for "information only." The acknowledgment which Douglass signed makes no mention of the arbitration provision contained in the Handbook, nor sufficiently informs him that the Handbook contains terms to which he is contractually obligating himself. Nothing in the acknowledgment form that Douglass signed suggests to us that he was entering into an arbitration agreement.
. . . .
... [T]he arbitration provision at issue here is not "boxed off" or otherwise set apart from the other provisions in the Handbook or on the acknowledgment form.... Moreover, the agreement.. is located on page 20 of the sixty-page Handbook, and Douglass' signature is not found until forty pages later on the acknowledgment page, which, as previously pointed out, makes no mention of the arbitration provision.
Id. at 533, 135 P.3d at 142 (emphasis omitted).
In the instant case, the arbitration agreement provided in relevant part:
If any dispute arises between you and us with respect to any invoice issued by us or regarding our services to you, we and you agree that each will attempt to resolve the dispute with the other through friendly, amicable discussions and written correspondence, each in good faith attempting to understand and accept the merits of the other's positions. Should such negotiations fail to produce a mutually acceptable resolution of the dispute, we ask that you agree the dispute shall be submitted to mandatory binding arbitration.
(Emphases added.)
The plain language of the arbitration provision clearly states that any dispute arising between Jason and Damon Key would result in "friendly" and "amicable" dispute resolution and, if such negotiations failed, Jason agreed that the dispute would be submitted to mandatory binding arbitration. This case is unlike Brown in that the arbitration provision was located in the Agreement, which was only three pages long; the provision was clearly set off as a separate section of the Agreement; and Jason indicated his agreement to the provision directly below the provision.
Given the foregoing, the arbitration provision is unambiguous.

2. Whether arbitration provision not bilateral
The Vickerys argue that the arbitration provision is unenforceable as to Jason because it was not the result of bilateral consideration, i.e., it does not state that both parties agree to arbitrate their claims, but only that Jason agrees to submit any claims to arbitration. The Vickerys cite to Douglass in support of this argument.
In Douglass, with regard to the third element of the Brown test  the existence of bilateral consideration the supreme court stated: "It is well-settled that consideration is an essential element of, and is necessary to the enforceability or validity of, a contract. Consideration is defined as a bargained for exchange whereby the promisor receives some benefit or the promisee suffers a detriment." 110 Hawai`i at 534, 135 P.3d at 143 (quoting Shanghai Inv. Co. v. Alteka Co., 92 Hawai`i 482, 496, 993 P.2d 516, 530 (2000), overruled on other grounds by Blair v. Ing, 96 Hawai`i 327, 31 P.3d 184 (2001)).
The arbitration provision at issue in Douglass provided that the "parties agree not to institute any action in any court... against the other." 110 Hawai`i at 534-35, 135 P.3d at 143-44. However, the second paragraph of the acknowledgment form Douglass signed contained the following reservation: "The Company has the right to change this handbook at any time and without advance notice." Id. at 523 & 535, 135 P.3d at 132 & 144.
The supreme court stated that although the arbitration provision "on its face" was supported by bilateral consideration because "both Douglass and Pflueger would forego their respective rights to a judicial forum and accept the binding arbitration process," the "reservation of rights language contained in the acknowledgment form render[ed] the purported arbitration agreement illusory." Id. at 535, 135 P.3d at 144 (emphasis in original). The supreme court held that the third requirement in Brown was not met because the arbitration agreement lacked "mutuality of obligation." Douglass, 110 Hawai`i at 535, 135 P.3d at 144 (internal quotation marks and citation omitted).
In Brown, Drake Alabanza (Drake) and his wife, Lou Alabanza (Lou), (collectively, the Alabanzas) filed in the circuit court a complaint including a race discrimination claim against KFC National Management Company (KFC), Drake's former employer, and other defendants. 82 Hawai`i at 228, 921 P.2d at 148. KFC filed a motion to stay action and compel arbitration, asserting that an arbitration agreement reflected in an application for employment that Drake had signed compelled the Alabanzas to arbitrate their claims. Id. at 228-31, 921 P.2d at 148-51. The circuit court denied the motion. Id. at 231, 921 P.2d at 151.
KFC appealed, contending that
(1) the circuit court erred in ruling, as a matter of law, that the arbitration agreement reflected in Drake's employment application was `not an enforceable arbitration clause within the scope of Chapter 658 of the [HRS]'; and
(2) an arbitration agreement is not unenforceable merely because it is included in an application for employment that disclaims any implied or express contract of employment."
82 Hawai`i at 229, 921 P.2d at 149.
The supreme court held as a matter of law "that the arbitration agreement imposed upon Drake by KFC as an adjunct of his employment application [wa]s enforceable against Drake and [wa]s not an unenforceable contract of adhesion." Id. The supreme court further held that although it was not an employment contract, the arbitration agreement constituted a written and valid contract to arbitrate, id. at 237-40, 921 P.2d at 157-60, that was "written" pursuant to, among other things, the Federal Arbitration Act (FAA), which governed Drake's claims. Id. at 229 & 238-39, 921 P.2d at 149 & 158-59. Again citing to the FAA, as well as other sources, the supreme court then held that the arbitration agreement was valid because it was unambiguous and was "supported by the bilateral consideration that [the parties] would forego their respective rights to a judicial forum, given `the delay and expense which results from the use of the federal and state court systems,' in order to benefit from the resulting time and cost savings." Id. at 239-40, 921 P.2d at 159-60.
Douglass and Brown are inapplicable to this case with respect to this issue because they concerned arbitration agreements that were not part of a larger contract, whereas the arbitration provision in this case was part of the Agreement. In Douglass and Brown, the Hawai`i Supreme Court was tasked with determining whether the respective arbitration agreements, standing alone, could constitute contracts. Here, we need not make such a determination because neither party disputes that the Agreement involved a mutual exchange of consideration. As Damon Key states in its answering brief, " [t]he consideration given by Damon Key for the contract was its agreement to provide legal services to Jason. This consideration by Damon Key is sufficient to make the arbitration clause of the contract enforceable even if Damon Key's requirement to arbitrate is not co-extensive with that of Jason." The Vickerys cite to no case law, and we find none, for the proposition that an arbitration provision must involve its own separate, mutual exchange of consideration.[2]

3. Arbitration provision is "adhesion contract"
The Vickerys maintain that the arbitration provision is an adhesion contract provision and allege the following in their argument on this issue:
(a) The arbitration provision improperly limits Damon Key's liability;
(b) Damon Key, the party of superior bargaining strength, gave the agreement to Jason, the weaker and less sophisticated party, on a take-it-or-leave-it basis;
(c) Jason could not have reasonably known that the provision amounted to a waiver of his right to a jury trial or that it encompassed his potential claims for legal malpractice; and
(d) the provision was unduly oppressive and unconscionable.
A contract of adhesion "is drafted or otherwise proffered by the stronger of the contracting parties on a `take it or leave it' basis." Brown, 82 Hawai`i at 247, 921 P.2d at 167. "Consequently, the terms of the contract are imposed upon the weaker party who has no choice but to conform." Id. A contract of adhesion is
unenforceable if two conditions are present: (1) the contract is the result of coercive bargaining between parties of unequal bargaining strength; and (2) the contract unfairly limits the obligations and liabilities of, or otherwise unfairly advantages, the stronger party. Arbitration agreements are not usually regarded as unenforceable contracts of adhesion because the second condition is generally lackingthat is, the agreement bears equally on the contracting parties and does not limit the obligations or liabilities of any of them, but merely substitutes one forum for another.
Id. (internal quotation marks and citations omitted).
The Hawaii Supreme Court has stated that, as a remedy, "some courts look past the wording of the contract and consider the entire transaction in order to effectuate the reasonable expectations of the parties." Leong v. Kaiser Found. Hosp., 71 Haw. 240, 247, 788 P.2d 164, 168 (1990) (quoting Robin v. Blue Cross Hosp. Serv., Inc., 637 S.W.2d 695, 697 (Mo. 1982)).
In Tatibouet v. Ellsworth, 99 Hawai`i 226, 240, 54 P.3d 397, 411 (2002), the Hawai`i Supreme Court held that an arbitration agreement in a contract was not adhesive where, among other things, both parties to the contract Tatibouet, the Chief Executive Officer and majority shareholder of Aston Hotels and Resorts (Aston), and Ellsworth, an Aston employee who helped Tatibouet purchase two hotels in the San Francisco area  had been of equal bargaining power; both parties had agreed to be bound by the finality and binding effects of arbitration decisions; and the arbitration clause provided, inter alia, that "the decision of any two of [the arbitrators] shall be final, conclusive and binding upon all parties, all as provided in [HRS] Chapter 658." Id. at 229 & 240, 54 P.3d at 400 & 411.
In this case, although Damon Key arguably had bargaining strength that was superior to Jason's and the arbitration provision bound Jason but not Damon Key, in the context of the contract as a whole we do not believe that the arbitration provision "unfairly limits the obligations and liabilities of, or otherwise unfairly advantages" Damon Key. Brown, 82 Hawai`i at 247, 921 P. 2d at 167. Rather, the provision "merely substitutes one forum for another." Id. Here, Jason has not established that Damon Key was the only immigration firm that could represent him. Further, there is no evidence that had Jason declined the arbitration provision, the Agreement as a whole would have been nullified  i.e., that the provision was a "take-it-or-leave-it" proposition.

4. Arbitration provision is "prohibited transaction"
The Vickerys argue that the arbitration provision constitutes a "prohibited transaction," in violation of Hawaii Rules of Professional Conduct (HRPC) Rule 1.8(h) because the provision limits Jason from pursuing legal remedies in court and Damon Key never advised Jason that he should seek independent representation before signing the agreement. HRPC Rule 1.8(h) provides in relevant part that "[a] lawyer shall not make an agreement prospectively limiting the lawyer's liability to a client for malpractice."
The arbitration agreement did not prospectively limit Damon Key's liability to Jason; rather, it exchanged one forum for another in the case of a dispute that could not amicably be resolved.

5. Result
The circuit court did not err by granting Damon Key's motion to compel Jason to arbitrate his claims against Damon Key.

B. Cross-Appeal
Damon Key argues that the circuit court erred when it denied Damon Key's motion to compel Cherie to arbitrate her claims.

1. Whether Cherie was an intended third-party beneficiary as to malpractice claim
Damon Key maintains that Cherie's legal malpractice claim, if she has one, is subject to arbitration because as a third-party beneficiary of the Agreement, Cherie was bound by the contract's arbitration provision.
"Arbitration is a matter of contract; so a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Sher, 114 Hawai`i at 267, 160 P.3d at 1254 (internal quotation marks and citation omitted). On the other hand, "[i]t is a commonly-accepted axiom that a holder of third-party beneficiary status may not avoid otherwise enforceable contract provisions. A third-party beneficiary of a contract containing an arbitration clause can be subject to that clause and compelled to arbitrate on the demand of a signatory." Id. at 269, 160 P.3d at 1256 (internal quotation marks, citations, and brackets in original omitted).
In Blair v. Ing, 95 Hawai`i 247, 21 P.3d 452 (2001), the Hawai`i Supreme Court stated the following with regard to the third-party beneficiary theory:
[A] third party beneficiary theory is commonly advanced to establish liability to a non-client who is not in strict privity with an attorney. See generally, 4 Legal Malpractice § 31.4. This approach focuses upon whether the primary purpose of the client-attorney relationship was to benefit the non-client. Donahue[ v. Shughart, Thomson & Kilroy, P.C., 900 S.W.2d 624, 628 (Mo. 1995)] (holding, inter alia, that, as an exception to the general rule that an attorney is only liable to his client for negligence, a non-client may maintain a legal malpractice action based upon a third party beneficiary claim) (citations omitted). "The essence of a third-party beneficiary's claim is that others have agreed between themselves to bestow a benefit upon the third party but one of the parties to the agreement fails to uphold his portion of the bargain." Copenhaver v. Rogers, 238 Va. 361, [367,] 384 S.E.2d 593, 596 (1989). Thus, "the third party beneficiary approach focuses the existence of a duty entirely on whether the plaintiff was the person intended to be benefitted by the legal services and does not extend to those incidentally deriving an indirect benefit." Donahue, 900 S.W.2d at 628. In other words, the non-client must have been an intended beneficiary, not merely an incidental beneficiary.
In Guy v. Liederbach, 501 Pa. 47, 459 A.2d 744 (1983), the Pennsylvania Supreme Court articulated a two-part test for determining whether a person is an intended third party beneficiary under the Restatement (Second) of Contracts § 302. In part one of the test, the trial court possesses the discretion to confer standing under a third party beneficiary theory by determining whether "the recognition of the beneficiary's right is `appropriate to effectuate the intention of the parties.'" Id. at 751. Under part two, the performance must "'satisfy an obligation of the promisee to pay money to the beneficiary' or `the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.'" Id.

The court in Guy applied this test to beneficiaries under a will as follows:
The underlying contract is that between the testator and the attorney for the drafting of a will. The will, providing for one or more named beneficiaries, clearly manifests the intent of the testator to benefit the legatee. Under Restatement (Second) § 302(1), the recognition of the "right to performance in the beneficiary" would be "appropriate to effectuate the intention of the parties" since the estate either cannot or will not bring suit. Since only named beneficiaries can bring suit, they meet the first step standing requirement of § 302. Being named beneficiaries of the will, the legatees are intended, rather than incidental, beneficiaries who would be § 302 (1) (b) beneficiaries for whom "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." In the case of a testator-attorney contract, the attorney is the promisor, promising to draft a will which carries out the testator's intention to benefit the legatees. The testator is the promisee, who intends that the named beneficiaries have the benefit of the attorney's promised performance. The circumstances which clearly indicate the testator's intent to benefit a named legatee are his arrangements with the attorney and the text of his will.
459 A.2d at 751-52 (footnote omitted).
92 Hawai`i at 255-56, 21 P. 3d at 460-61 (footnote and brackets in original omitted).
In this case, we believe that although Cherie may have been an incidental beneficiary, she was not a third-party beneficiary of the Agreement. See id. at 255, 21 P.3d at 460.

(a) No intent to bestow benefit upon Cherie
There is no evidence that Jason and Damon Key "agreed between themselves to bestow a benefit upon" Cherie. Id. This distinguishes this case from Sher, which Damon Key cites to in support of this argument.
The Shers filed a complaint in the Circuit Court of the Second Circuit (the court) against Coldwell Banker Island Properties (CBIP) and two agents of CBIP (collectively, Appellants), and two other defendants, 114 Hawai`i at 265, 160 P.3d at 1252. CBIP had been the listing broker on a property the Shers had purchased. Id. The Shers alleged various claims related to alleged defects in the property. Id. at 266, 160 P.3d at 1253. Pursuant to an Acquisition Agreement the Shers had signed with the seller of the property, the Shers filed a Motion to Compel Arbitration in the court. Id. at 265-66, 160 P.3d at 1252-53. The court granted the motion. Id. at 266, 160 P.3d at 1253.
On appeal, Appellants argued, inter alia, that they could not be compelled to participate in binding arbitration because CBIP never signed the Acquisition Agreement that contained the arbitration clause and Appellants were not third-party beneficiaries of the Acquisition Agreement. Id.
A paragraph of the Acquisition Agreement stated:
E. Commission, Seller agrees to pay to Coldwell Banker Island Properties, Wailea Realty, and Sotheby's collectively a real estate broker's commission of Three Hundred Fifty Thousand and no/100 Dollars ($350,000.00) only in the event that [the Shers] complete [] the transaction and closing occurs, which commission shall come from the closing proceeds at Escrow.
Id. at 269, 160 P.3d at 1256. This court held that the "paragraph clearly and unambiguously state[d] an intent to confer a benefit upon CBIP," thus satisfying the second prong of a three-part test described in E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S, 269 F.3d 187, 196 (3rd Cir. 2001).[3] Sher, 114 Hawai`i at 270, 160 P.3d at 1257.
Unlike the Acquisition Agreement in Sher, the Agreement in this case did not name Cherie at all, let alone state an intent to confer a benefit on her.

(b) Guy v. Liederbach test
Damon Key's third-party beneficiary theory with regard to Cherie does satisfy the test put forth in Guy v. Liederbach, 501 Pa. 47, 459 A. 2d 744 (1983), which the Hawai`i Supreme Court cited to in Blair, 95 Hawai`i at 255, 21 P. 3d at 460. First, Cherie had no rights under the Agreement, let alone rights that were "appropriate to effectuate the intention of" Jason and Damon Key in executing the Agreement. Blair, 95 Hawai`i at 256, 21 P.3d at 461 (internal quotation marks and citation omitted). Again, the Agreement expresses no intent to benefit Cherie.
With regard to the second part of the test in Guy, in this case, Damon Key was the promisor, promising to represent Jason in his immigration matters, and Jason was the promisee. There is no evidence in this case that Jason intended Cherie to have the benefit of Damon Key's promised performance. Therefore, Damon Key's performance would not have "satisf[ied] an obligation of the promisee [Jason]... to [Cherie]" and the circumstances did not "indicate that the promisee [Jason] intend[ed] to give [Cherie] the benefit of the promised performance." Blair, 95 Hawai`i at 256, 21 P.3d at 461 (internal quotation marks and citation omitted).
Because Cherie was not a third-party beneficiary of the Agreement, any malpractice claim that Cherie may have against Damon Key is not subject to arbitration.

2. Cherie's claims derivative of Jason's
Damon Key argues that Cherie's alleged "tort claim" is derivative of Jason's; therefore, just as Jason's claim is subject to arbitration, so is Cherie's. We interpret "tort claim" to mean Cherie's claims for "extreme pain and suffering, mental anguish, severe emotional and mental distress, disruption of lifestyle, and loss of enjoyment of life" and deprivation of Jason's "services, love, attention, consortium, companionship, comfort, and society" as a result of Damon Key's alleged malpractice.
In Brown, the Alabanzas' complaint included Lou's derivative claims for loss of consortium and negligent and intentional infliction of emotional distress against KFC and the other defendants. 82 Hawai`i at 231, 921 P. 2d at 151. On appeal, the Alabanzas argued that Lou could not be compelled to arbitrate her claims because she did not sign the arbitration agreement between Drake and KFC. Id. at 240, 921 P.2d at 160. The Hawai`i Supreme Court stated that it would resolve the issue by first determining whether Lou's claims were derivative of Drake's and, if so, whether they were separable. Id.
The Hawai`i Supreme Court stated the following with regard to derivative claims:
"Derivative" has been defined to mean "[t]hat which has not its origin in itself, but owes its existence to something foregoing." Black's Law Dictionary 443 (6th ed. 1990). Under Hawai`i law, a spouse's claim of emotional distress, based on an injury to her husband, is a "derivative" claim sounding in tort. First Ins. Co. of Hawaii v. Lawrence, 77 Hawai`i 2, 17, 881 P. 2d 489, 504, re consideration denied, 11 Hawai`i 373, 884 P.2d 1149 (1994). Similarly, "loss of consortium is a derivative action [;] i.e., [an] action by [a] spouse for loss of consortium is derivative of the action for damages by the injured spouse." Towse v. State, 64 Haw. 624, 637, 647 P.2d 696, 705 (1982) (citations omitted). See also Mist v. Westin Hotels, 69 Haw. 192, 196-200, 738 P.2d 85, 89-91 (1987); Yamamoto v. Premier Ins. Co., 4 Haw. App. 429, 435-436, 668 P.2d 42, 48 (1983), overruled on other grounds in Doi v. Hawaiian Ins. & Guar. Co., 6 Haw. App. 456, 727 P.2d 884 (1986); Black's Law Dictionary at 444 (defining "derivative action," inter alia, to mean "actions based on injury to another; e.g., action for loss of consortium by husband against third person for injuries to wife").
However, as the Hawai`i Intermediate Court of Appeals (ICA) stated in Yamamoto, claims such as loss of consortium are "only derivative in the sense that [they do] not arise unless one's spouse has sustained a personal injury. The loss of consortium claim is a claim for damages independent and separate from the spouse's claim for damages." Yamamoto, 4 Haw. App. at 435-36, 668 P.2d at 48 (citing Norwest v. Presbyterian Intercommunity Hosp., 52 Or. App. 853, 631 P.2d 1377 (1981), aff'd, 293 Or. 543, 652 P.2d 318 (1982), and Fitzgerald v. Meissner & Hicks, Inc., 38 Wis. 2d 571, 157 N.W.2d 595 (1968)) (footnote omitted). Thus, while these types of derivative claims are barred when the victim's initial claim of injury cannot be maintained, Towse, 64 Haw. at 637, 647 P.2d at 705, and are subject to defenses premised on the injured spouse's contributory or comparative negligence, see Mist, 69 Haw. at 199, 738 P.2d at 91, it does not inevitably follow that they must be adjudicated in the same forum as the claims for injury to which they relate or that they are not otherwise separable.
Brown, 82 Hawai`i at 240-41, 921 P.2d at 160-61.
The supreme court went on to hold that
[a]lthough [Lou's] claims are "derivative" in the sense that they arise out of an alleged tortious injury to Drake sustained during his employment with KFC or upon his termination therefrom, they are separable from his, and her potential damages are not coextensive with his. We therefore hold that, to the extent that she is not pursuing claims as Drake's agent or under a breach of contract theory (pursuant to which she stands in Drake's shoes), Lou is not bound by the arbitration agreement between Drake and KFC.
Id. at 243, 921 P.2d at 163.
We believe that this case is like Brown with regard to this issue. Cherie's alleged tort claims are derivative of Jason's malpractice claims in the sense that but for Jason's malpractice claims, Cherie would not have suffered the injuries of which she complains. Nevertheless, Cherie's alleged claims are separable from Jason's, so she is not bound by the arbitration provision in the Agreement. In reaching this conclusion, we do not address the factual or legal sufficiency of Cherie's alleged tort claims, since that issue is not before us.

3. Result
The circuit court did not err by denying Damon Key's motion to compel Cherie to arbitrate her claims against Damon Key.

IV. CONCLUSION
The Order Granting in Part Motion to Compel Arbitration and Ordering Stay of Action filed on May 16, 2007 in the Circuit Court of the First Circuit is affirmed.
NOTES
[1] The Honorable Victoria S. Marks presided.
[2] Damon Key concedes it is bound by the arbitration agreement, but in light of our analysis, we need not address this issue.
[3] In E.I. DuPont, the United States Court of Appeals for the Third Circuit held:

Under Delaware law, which is the law the parties discuss, to qualify as a third party beneficiary of a contract, (a) the contracting parties must have intended that the third party beneficiary benefit from the contract, (b) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and (c) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract. Guardian Constr. Co. v. Tetra Tech Richardson, Inc., 583 A.2d 1378, 1386 (1990) ("In order for third-party beneficiary rights to be created, not only is it necessary that performance of the contract confer a benefit upon a third person that was intended, but the conferring of the beneficial effect on such third-party, whether it be creditor or donee, should be a material part of the contract's purpose.").
269 F.3d at 196.